UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

CHEMICAL WASTE
MANAGEMENT, INC., *et al.*,

    Defendants.

Case No. 3:22-cv-132

District Judge Michael J. Newman
Magistrate Judge Peter B. Silvain, Jr.

---

**ORDER: (1) GRANTING THE UNITED STATES'S UNOPPOSED MOTION TO APPROVE THE CONSENT DECREE (DOC. NO. 4); AND (2) ADOPTING THE CONSENT DECREE (DOC. NO. 2-1)**

---

This case is before the Court, on behalf of the United States Environmental Protection Agency ("EPA"), on the United States's unopposed motion to enter a Consent Decree that resolves the claims against Defendants under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9606, 9607, and 9613(b).  Doc. No. 4; *see also* Doc. No. 2-1.  No Defendant has filed an opposition memorandum, and the time for doing so has passed.  No third party has sought to intervene in this matter nor objected to this Court's entry of the Consent Decree.  For the following reasons, the Court **GRANTS** the United States's motion and **ADOPTS** the Consent Decree.

**I.**

From 1976 to late 1979, companies disposed of liquid and containerized hazardous waste in what is now known as the Tremont City Barrell Fill Site Superfund Alternative Site ("SAS") (the "Barrell Fill").  Doc. No. 2-2 at PageID 77.  The Barrell Fill is an 8.5 square acre portion of the Tremont City Landfill SAS, an industrial landfill located in Clark County, Ohio, within the

Court's jurisdiction. *Id.* During operations, drummed waste was placed in 50 waste cells excavated into natural glacial till material. *Id.* Wastes included glues, resins, paint sludge, paint scrap, soap, shampoo, detergents, asbestos, slurry, food wastes, caustic waste, oils, and still bottoms (residues from distillation processes such as oil refining and solvent recycling). *Id.* The Barrel Fill contains approximately 51,500 drums of waste and approximately 304,000 gallons of non-containerized liquids, sludge, and biodegradable wastes. *Id.* These wastes include various hazardous substances including heavy metals and VOCs. *Id.* at PageID 94; Doc. No. 4-3 at PageID 524. An EPA investigation revealed the waste seeped into, and contaminated, the surrounding soil and local water sources. Doc. No. 2-2 at PageID 94.

In 2002, a group of companies responsible for the waste, at the EPA's direction, conducted a Remedial Investigation/Feasibility Study ("RI/FS") to determine the best way to remediate the Barrell Fill. Doc. No. 4-3 at PageID 524. The EPA approved the RI/FS and issued a Record of Decision ("ROD") endorsing the clean-up strategy. *Id.* Remediation includes the following steps: removal and staging of the existing soil cover before excavating the drummed and non-containerized waste from the 50 waste cells; pumping of all liquid waste, containerized and non-containerized, from the waste cells; and treatment and disposal off-site of all liquid waste at a treatment, storage, and disposal facility or at a publicly-owned treatment works. Doc. No. 2-2 at PageID 73–75. The remedy also calls for construction of a new "engineered waste cell" which will be used to consolidate non-containerized and drummed solid (hazardous and non-hazardous) wastes and contaminated soil and will be reinforced with clay liners and other engineering improvements to ensure containment. *Id.* The EPA and responsible parties will conduct long-term groundwater monitoring and post-closure care. *Id.* The projected remediation cost is $27,746,000. Doc. No. 4-3 at PageID 524.

In October 2019, the EPA offered the responsible parties an opportunity to voluntarily implement the remediation plan. *Id.* Many agreed and formed a working group to do so. *Id.* Over the next two-and-a-half years, the EPA and the responsible parties, all of whom were represented by counsel, negotiated this consent decree. Doc. No. 2-1 at PageID 14, 18–19; Doc. No. 2-5 at PageID 385. Some of the companies, including lead Defendant Chemical Waste Management, Inc., the corporate successor in interest to the Barrell Fill operator, agreed to perform the remediation work (the "Settling Work Parties"). Doc. No. 2-1 at PageID 14, 18–19; Doc. No. 2-5 at PageID 385. Others opted to financially contribute to the clean-up efforts (the "Other Settling Parties") but are not obligated to complete any work. Doc. No. 2-1 at PageID 14, 18–20; Doc. No. 2-6 at PageID 386–92. The Other Settling Parties are not bound by the consent decree, although they may voluntarily join by reaching financial contribution agreements with the Settling Work Parties. *Id.* The Settling Work Parties agreed to reimburse the EPA $500,000 for past oversight costs and any future costs incurred by the EPA over $4,020,000. Doc. No. 2-1 at PageID 30.[1] The Settling Work Parties must also perform community outreach to promote the clean-up efforts. *Id.* at PageID 22–23; Doc. No. 2-4 at PageID 359.

In exchange for remediation, the United States provided the Defendants with a covenant not to sue. Doc. No. 2-1 at PageID 45–46. The covenant only attaches when the remedy has been implemented. *Id.* It also includes certain exceptions for non-completion of work and new, or previously undiscovered, hazardous conditions. *Id.*

---

[1] The EPA also collected approximately $4,754,472 million in response costs through bankruptcy proceedings of other responsible parties. Doc. No. 4-3 at PageID 524. Under the Consent Decree, Defendants can be reimbursed $3,754,472 of these funds for their remediation, and the EPA can devote the remaining $1 million to future response costs. *Id.*; *see also* Doc. No. 2-1 at PageID 14.

The EPA distributed the Consent Decree for public comment. Doc. No. 4-2 at PageID 520. It received one comment supporting the Consent Decree and calling for its expeditious entry. *Id.* at PageID 521–22.

The United States filed a complaint against the Settling Work Parties in this Court and simultaneously lodged the Consent Decree. Doc. Nos. 1, 2, 2-1. The United States now moves for entry of the Consent Decree. Doc. No. 4.

## II.

CERCLA authorizes the President "to remove or arrange for the removal of, and provide for remedial action relating to [any] hazardous substance, pollutant, or contaminant at any time . . . or take any other response measure . . . necessary to protect the public health or welfare or the environment." 42 U.S.C. § 9604(a)(1). CERCLA also provides that responsible parties are liable for the "response costs" that the EPA incurs while investigating, and designing a plan to cleanse, contaminated sites. 42 U.S.C. § 9607(a). The EPA may implement response actions itself, 42 U.S.C. § 9604(a)(1) and (b), or enter into settlements with responsible parties to facilitate remediation, 42 U.S.C. § 9622(a).

When presented with a consent decree, the Court must determine whether it is "fair, adequate, and reasonable, as well as consistent with the public interest." *United States v. Lexington-Fayette Urb. Cnty. Gov't*, 591 F.3d 484, 489 (6th Cir. 2010) (quoting *United States v. Cnty. of Muskegon*, 298 F.3d 569, 580–81 (6th Cir. 2002)). A consent decree must pass a "three-part test of (1) fairness, (2) reasonableness, and (3) consistency with CERCLA's goals." *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1426 (6th Cir. 1991) (citation omitted). "The requirement of court approval is intended to help [e]nsure that the proposed settlement will serve the public interest by facilitating restoration of the environment and by adequately compensating the taxpayers for the cleanup costs that will be incurred." *United States v. City of Grand Rapids*,

166 F. Supp. 2d 1213, 1218 (W.D. Mich. 2000) (quoting *United States v. Davis*, 11 F. Supp. 2d 183, 188 (D.R.I. 1998)).

Consent decrees "embod[y] a compromise[] in exchange for the saving of cost and elimination of risk." *U.S. v Armour & Co.*, 402 U.S. 673, 681 (1971). The Court's role in reviewing a proposed consent decree "is limited to approval or rejection of the decree and it remains EPA's responsibility to select the remedy and to take the steps necessary to bring the decree to the court for approval." *Akzo Coatings*, 949 F.2d at 1425. The "presumption [of settlement approval] is particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal administrative agency like EPA[,] which enjoys substantial expertise in the environmental field." *Lexington-Fayette*, 591 F.3d at 490–91 (quoting *Akzo*, 949 F.2d at 1436).

## III.

The proposed Consent Decree satisfies the settlement approval criteria. It was a product of contentious, arms-length negotiation. It requires the Settling Work Parties to perform, and fund, the Barrell Fill remediation as described in the ROD. The Consent Decree also includes a mechanism for obtaining contributions from the Other Settling Parties. To maintain compliance and facilitate clean-up, the Consent Decree gives the EPA several tools to ensure the Settling Work Parties meet their obligations and the flexibility to respond to new, or unforeseen, contamination. The Court therefore finds the Consent Decree to be fair, reasonable, adequate, and in the public interest.

### A. Fairness

#### 1. Procedural Fairness

Procedural fairness requires the Court to consider "the strength of plaintiff's case, the good faith efforts of the negotiators, the opinions of counsel, and the possible risks involved in the

litigation if the settlement is not approved." *Akzo Coatings*, 949 F.2d at 1435 (citations omitted). "The effect on non-settlers should be considered[] but is not determinative in the court's evaluation." *Id.* The Court should also "look to the negotiation process and attempt to gauge its candor, openness[,] and bargaining balance." *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 86 (1st Cir. 1990) (citations omitted).

The Consent Decree, as noted, was the product of contentious, arms-length negotiation. Doc. No. 4-3 at PageID 525. The parties, represented by sophisticated counsel, negotiated the agreement for two years. *Id.* They exchanged multiple drafts of the Consent Decree and Statement of Work, and each side moved from their original positions. *Id.* Nothing in the record suggests bad faith or collusion. *See, e.g.*, *United States v. BP Expl. & Oil Co.*, 167 F. Supp. 2d 1045, 1051–52 (N.D. Ind. 2001) (finding an agreement procedurally fair when the record indicated no bad faith or collusion). The Consent Decree was also submitted for public comment and received only positive feedback. Doc. No. 4-2 at PageID 520–22; 87 Fed. Reg. 32060 (May 26, 2022). The Court finds the Consent Decree satisfies the procedural fairness element. *See, e.g.*, *United States v. Doe Run Res. Corp.*, No. 4:20-cv-234, 2020 WL 3972001, at *3 (E.D. Mo. 2020) (a consent decree negotiated over a period of years, by sophisticated counsel, and that was a product of back-and-forth discussions is procedurally fair).

### 2. Substantive Fairness

Substantive fairness requires that settlement terms "be based upon, and roughly correlated with, some acceptable measure of comparative fault, apportioning liability among the settling parties according to rational (if necessarily imprecise) estimates of how much harm each [potentially responsible party ("PRP")] has done." *Cannons*, 899 F.2d at 87. "Whatever formula or scheme the EPA advances for measuring comparative fault and allocating liability should be upheld so long as the agency supplies a plausible explanation for it, welding some reasonable

linkage between the factors it includes in its formula or scheme and the proportionate shares of the settling PRPs." *Id.* "Relative fault is not the only factor that district courts should take into account when appraising the fairness of a settlement. The likelihood of [plaintiffs] prevailing at trial and the adequacy of the resources of the most culpable party, for example, may also be taken into account." *In re Masters Mates & Pilots Pension Plan & IRAP Litig.*, 957 F.2d 1020, 1031 (2d Cir. 1992) (citation omitted).

The Consent Decree is substantively fair. It requires the Settling Work Parties to implement the EPA-approved clean-up plan at significant cost. Doc. No. 2-2 at PageID 73–75; Doc. No. 4-3 at PageID 524. The Settling Work Parties must also reimburse the EPA if its oversight costs exceed $4,020,000. Doc. No. 2-1 at PageID 30. If Other Settling Parties join the remediation effort through amendment to the Consent Decree, it will further spread the financial burden. *Id.* at PageID 14, 18–20; Doc. No. 2-6 at PageID 386–92.

Settling this matter now, after years of investigation and negotiation, saves all parties time and expense. *See, e.g.*, *Rusiecki v. City of Marquette*, 64 F. App'x 936, 938 (6th Cir. 2003) ("[S]ettlement agreements should be upheld whenever it is equitable to do so" (citation omitted)). Resolution without protracted litigation hastens the time in which clean-up can begin. *See, e.g.*, *Akzo Coatings*, 949 F.2d at 1436 (noting that settlement is favored given "uncertain" liability, the duration of pollution, and the EPA's interest in convincing the responsible parties "to get on with the job and clean up a long-standing mess" (citing *Cannons*, 899 F.2d at 90)). It also provides the parties with certainty amidst the risk of litigation. *See, e.g.*, *Grand Rapids*, 166 F. Supp. 2d at 1222 ("The EPA must be permitted to grant a discount for the cost savings associated with an early settlement, a discount for assumption of open-ended risks, or a premium for the benefit of being

permitted to cash out and avoid future liability" (citing *Cannons*, 899 F.2d at 88)). These considerations indicate the Consent Decree is substantively fair.

### B. Reasonable and Adequate

To assess the reasonableness and adequacy of a settlement agreement, the Court considers "the nature/extent of hazards; the degree to which the remedy will adequately address the hazards; possible alternatives for remedying hazards; and the extent to which the decree furthers the goals of the statute." *Akzo Coatings*, 949 F.2d at 1436 (citation omitted). The reasonableness determination is, "like that of fairness, is a pragmatic one, not requiring precise calculations." *United States v. Charter Intern. Oil Co.*, 83 F.3d 510, 521 (1st Cir. 1996) (citation omitted). "With respect to consistency with CERCLA's goals, courts consider the statutory purposes of ensuring prompt cleanup of hazardous sites, placing the costs of cleanup on PRPs, and encouraging settlement." *United States v. NCR Corp.*, No. 1:19-cv-1041, 2020 WL 8574835, at *6 (W.D. Mich. Dec. 2, 2020) (citing *Best Foods v. Aerojet-Gen. Corp.*, No. 1:89-cv-503, 2000 WL 1238910, at *12 (W.D. Mich. Aug. 24, 2000)).

The Consent Decree requires the Settling Work Parties to remedy the Barrell Fill consistent with the ROD approved by the EPA. Doc. No. 4-3 at PageID 524. If they shirk their duties, the EPA can take over the decontamination and extract statutory penalties from the Settling Work Parties. Doc. No. 2-1 at PageID 26–28, 41–43. Should new, or undiscovered, hazardous conditions emerge at the Barrell Fill, the EPA can amend the Consent Decree to require the Settling Work Parties take further remedial efforts. *Id.* at PageID 23–24, 45. This adaptive enforcement structure makes the Consent Decree an effective tool for "cleansing the environment." *Cannons*, 899 F.2d at 89–90.

### C. Public Interest

A settlement that meets the operative statute's goals is in the public interest. *See, e.g.*, *Lexington-Fayette*, 591 F.3d at 490. For CERCLA consent decrees, the Court must ensure the agreement provides for the timely clean-up of hazardous sites with proportional contribution from the responsible parties. *See, e.g.*, *Akzo Coatings*, 949 F.2d at 1439 ("[T]he two principal goals of CERCLA [are] ensuring prompt effective remedial action while placing the financial burden of the cleanup on the PRPs" (citing *Walls v. Waste Res. Corp.*, 823 F.2d 977, 978–79 (6th Cir. 1987)). Settlements that devote taxpayer resources to decontaminating hazardous sites, not lengthy litigation, are consistent with CERCLA's aims. *See, e.g.*, *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 119 (2d Cir. 1992).

The Consent Decree meets CERCLA's intent and is, therefore, in the public interest. Doc. No. 2-1. It requires the responsible parties to undertake, and fund, the remediation efforts approved by the EPA. Doc. No. 2-2 at PageID 73–75; Doc. No. 4-3 at PageID 524. In the EPA's view, the work performed by the Settling Work Parties will result in the decontamination and modernization of the Barrell Fill's containment systems. Doc. No. 2-4 at PageID 355–84. Should the measures in the ROD prove insufficient, or the Settling Work Parties not fulfill their clean-up duties, the EPA can take steps to ensure remediation is complete. Doc. No. 2-1 at PageID 26–28, 41–43.

### IV.

Accordingly, the Court (1) **GRANTS** the United States's unopposed motion to approve the Consent Decree; and (2) **APPROVES and ADOPTS** the Consent Decree. The Court will docket a signed Consent Decree by separate entry.

**IT IS SO ORDERED.**

October 4, 2022                              s/Michael J. Newman
                                             Hon. Michael J. Newman
                                             United States District Judge